324-0021 consolidated with 324-0022, 324-0284, and 325-0027. International Brotherhood of Electrical Workers, AFL-CIO, Local Union 15, and Commonwealth Edison Company Appellants v. Illinois Commerce Commission and Environmental Law and Policy Center, Appelese. Thank you. Mr. Berlow, if you're ready to proceed, your time will start now. Thank you, Your Honor, and may it please the Court. Clifford Berlow on behalf of Commonwealth Edison. This action for administrative review arises from the first rates set pursuant to the Climate and Equitable Jobs Act, also known as CJA. And what CJA does is replace the previous rate-setting regime, which was known as formula rates, and really reverts back to the system for setting rates that predated the formula rate system that went into effect in 2011, with the one caveat that now the Commission is authorized to expressly set rates that are designed to be in effect for multiple years. We believe that in three different respects the Commission erred in the way it set Commonwealth Edison's rates in this case. The first has to do with the way in which it calculated and set ComEd's return on equity. The second is the Commission's refusal to provide a rate of return on ComEd's pension asset. And the third pertains to the way in which the Commission set ComEd's capital structure. Now, just at the outset, I want to say, well, we certainly recognize that what the Commission's doing and how it's doing it and all of the different financial considerations that go into it may be complicated. The basic principles of law that we are asking this Court to recognize are not. Indeed, they are straightforward, they are well-established, and in our view should be completely non-controversial. So just to start with the return on equity issue, the rule we are asking this Court to enforce is the same rule that was recognized by the United States Supreme Court in the Ohio Bell case, Justice Benjamin Cardozo, on behalf of a unanimous court, and also in the Hartigan case from 1987 in the Illinois Supreme Court. Again, unanimous decision on behalf of Justice Miller. And the rule is quite simply this. When the Commission is addressing an area that requires technical expertise and all of the expert evidence points in a particular direction, the Commission is not free to cast aside all of that expert testimony and chart its own course. And it is certainly not free to do so without providing pre-decisional notice to the parties about the method it intends to deploy and to deprive them of an opportunity to explain why that methodology is unsound. Mr. Berlo, you argued that they come up with their own formula. Couldn't it also be argued that they just put their own inputs into an agreed-upon formula? So, Justice Hedl, I think you're understanding the argument correctly in our point here, but let me be clear about what the limitations of how far we're going with this argument is. We are not questioning, even though the Commission insists otherwise, we are not questioning the Commission's ability to average the outputs of one of these complex financial models. I think we're all on common ground there that that is a permissible form of weighing evidence. For purposes of this case, I'm not even questioning what I think you're getting at here, which is whether or not the Commission can go into these mathematical models and tinker with the mathematics. I am willing to, for the sake of argument in this case, accept that they can do that. I think that's a future case whether they can go that far, but that's really not before the Court here. My submission to the Court is this. When the Commission goes beyond its standard practice of averaging and weighing the outputs of models and decides to invest itself into the direct manipulation of the underlying mathematics, the way in which it changes the models and the way in which it changes the math has to be supported by some evidence that's in the record, and that's what's lacking here. The Commission, in essence, took opinions about how to measure specific real-world phenomena that are not in the record and relied on those opinions, even though they're not in the record. I think it may be helpful to take this out of the abstract and be a little more concrete. Let's talk about first the CAPM model, which I think is maybe in some ways the more egregious of the two. The issue here, just as a backdrop, is that ComEd is not publicly traded. In order to understand what a rate of return that investors would expect to support the enterprise, we can't look at what ComEd's stock price is and how investors have responded to different factors. Instead, what we look at is the market as a whole with similar businesses. It makes sense. We take publicly traded public utilities, we analyze that data, and then we compare that to ComEd on the back end of this analysis. What the financial model is doing is looking at these comparison companies referred to as the proxy group. Here's where CAPM kicks in. The dispute here is over something called beta. While beta sounds abstract, it's actually quite easy to understand. We are trying to compare the riskiness of investing in one of those companies when compared to the market as a whole. We have expert testimony in this case about how best to measure beta, the riskiness of those companies as compared to the market as a whole. What they say is, well, the three credible experts that came into this case, that actually did the work, actually did the math, said, the way you do it is you look at the weekly betas. There was one expert who said, and you should also look at monthly data. And then you average the two together. But there is absolutely, positively, no witness whatsoever in the case who said the way you measure this is by looking only at the monthly information. So to get to the point, the fact that they use monthly betas only is beyond what they should be doing as a commission. That's absolutely correct, Your Honor. And look, if they had had expert testimony that had said, hey, this is a way in which this is a viable, plausible, correct way to do this, given the circumstances, they could rely on that testimony. We're not questioning that here. But that was totally lacking. And that puts them squarely in the Ohio Bell world. It puts them squarely into the world of Hartigan. I mean, take a look at how they treat those two cases, which lay out the rule of law that we're asking the court to apply. They dismiss Ohio Bell in a paragraph. And they say simply, well, that involved undisclosed data. And this case involves an undisclosed opinion. And we're allowed to rely on undisclosed opinions. We just can't rely on undisclosed data. That's not much of a distinction, because it's all evidence. And that's before you get into the fact that the Public Utilities Act, in particular, in Section 10103, says that you have to base your decisions in the word of that statute exclusively on the record evidence. And that's what's missing here. And as far as Hartigan goes, which is maybe more controlling and even more analogous, the commission ignores it. We say in our opening brief, in essence, that this is controlling authority. The commission doesn't cite it. It doesn't discuss it. It doesn't bother talking about it. And the reason is that there's no answer there. There you had a commission that said, we are going to decide, where we had expert testimony, all saying, these are the generally reliable accounting standards that are used in this particular circumstance. In Hartigan, the commission said, we'll ignore all of those, and we'll tell you what we think the generally acceptable accounting standards are. And the Illinois Supreme Court unanimously said, no, you can't do that. It violates Section 10103, and it's not consistent with substantial evidence. You can't collect this expert testimony and cast it aside. They did it a second time here as well, with respect to the growth rate under the DCF formula. There is not a single expert in the case who said you can rely solely on a non-constant presumed rate of growth. All of the experts said that you also have to rely upon a constant rate of growth, an assumption about the constant rate of growth. The only difference between the two is that in the CAPM context, there is affirmative testimony from the only expert who relied to any degree at all on the monthly betas, saying, well, the one thing you would never do is rely only on monthly betas. That would overweigh the monthly betas. You have to also account for the weekly betas. And so the commission said, we know better. We won't tell you what the credentials we have are of the people who came up with this. We won't tell you the methodology we deployed. We're just going to do this. And by the way, when we sought rehearing on this point, and we asked for leave to put in evidence in the record explaining that this was junk science, this was the equivalent of econometric alchemy, the commission said, no, we will not hear you. We're not interested in hearing why our new opinion is wrong. What about staff's suggestion that under the new four-year plan, there's less risk? I guess the suggestion is that that justifies a change in the way that they calculate this. Justice Breyer, I think that's a great question, and I think it really supports our position here, and here's why. If they had a concern about how ComEd compared to the proxy group, then after doing the financial modeling of the entities in the proxy group, which is what these models reflect, that might be a basis for a departure from the end results of those financial models. But ComEd plays no factor in the financial modeling itself. So even if you accept that finding, and frankly, we don't, but that would be a basis for dealing with the back end after the math is done and not going in and saying, hey, when I compare the members of the proxy group to the market as a whole, we think that they're more or less risky than the market as a whole. It's a complete non sequitur. So Justice Brennan, if that is the justification the commission is offering here for why it's doing what it's doing, I think the court should immediately recognize it for the total non sequitur that it is. I do want to turn, if I could, to the pension asset issue, if I may, unless there's other questions here on what I think is a pretty simple issue. And in some respects, pension asset may be even easier, and this may be one of those circumstances where the briefing really does crystallize and help narrow the scope of the issues in front of the court. The commission's brief is pretty clear that it does not quarrel with us about what the pertinent rule of law is. And the pertinent rule of law is that when a public utility creates an asset from its shareholders that benefits rate payers, a state agency like the commission cannot require that we provide the benefits of that asset for free. It's a taking. It violates hope and blue field. We also know, because the commission doesn't defend it, that its central rationale for denying us a rate of return here, they have completely abandoned. They said in their decision that the reason why we shouldn't get a rate of return is that the debt that our investors, our shareholders, took on to fund the pension asset had been completely repaid. We spend pages in our opening brief explaining why that's false, and there is not one single word in their response brief defending that finding. So if the commission wants to stand up in a few moments and say, hey, no, we didn't mean to give that up, I think the first question you should ask is please point me chapter and verse to the page and paragraph where you actually explain why this finding is supported by the evidence, because it isn't there. And so that really then boils down to a single question, which is, was the pension asset funded by rate payers or by shareholders? And the answer is very clear, because the commission at page 16 and 17 of its brief here, and also on page 38, concedes that the pension asset didn't exist prior to 2005, and that it was funded entirely by Exelon, a ComEd shareholder. Indeed, Your Honor. The $803,000 that went in, you just suggested that it's never been paid off. It has not been paid off. It is $803 million. It has never been paid off, and we explained that in our brief because this was funded through debt by Exelon that was in the form of bullet bonds. Bullet bonds operate differently than a mortgage. You're not paying off principal and interest at the same time. You pay off only interest until the last day, and then you pay off the entirety of the principal all at once at the very end, or you just refinance and pay that off with more debt. So it's impossible that there's any rate payer money anywhere in the pension asset, and the commission is now asking us to give away the benefits of that to the public for free, which is a taking. The only answer that the commission seems to have here is this argument that, well, you could have reproved to us from scratch a fact that we had already found. In 2005, the commission expressly finds that this pension asset was funded exclusively by Exelon, ComEd's shareholder, and we then rely on a factual finding that has been made by the commission, and then you have 2007. They do it again. They give us a full rate of return on our pension asset, and then 2009, we add more money in. Again, they make a finding expressly that this was funded, the additional money put into the pension asset was funded by Exelon, and so the commission points to not a scintilla of evidence that there's so much as a penny of rate payer money anywhere in the pension asset. May I just finish my thought, Your Honor? Yes, please do. They don't point to a scintilla of evidence. They just say, well, you could have treated this as unproven and reproven the case you proved to us in 2005, 2007, 2009 from scratch, and it's simply relying on our prior factual findings is impermissible. But again, it's a finding of fact. It's the equivalent of, and no pun intended, red light, or was the light red, or was the light green? Having made that finding, one would think that they would have some basis for thinking that their prior contemporaneously made factual finding was incorrect, and they don't identify that, and they don't have it here. If there are any other questions at this time, I'm happy to take them. Otherwise, I'll preserve my time for rebuttal. Justice Peterson? I do not. Not at this time. I do. Before we turn it over to Mr. Dodds, and I'm going to be somewhat liberal with your time here because I have some questions. Just simply, the pension asset, is the pension asset, the funds in the pension, in excess of what the pension needs to have funded to cover its debts? So, the pension asset, yes. I mean, essentially, the pension asset is the amount in the pension fund that exceeds the annual expense. And that overage, if you will, is generating a rate of return. The money generated from that is being used to defray the cost that rate payers would otherwise pay because our annual pension expense is something that's included in rate base. And why is it reasonable to do that, as opposed to use that money to buy light bulbs and fix the system? So, the simple answer to that question, Your Honor, is that the commission effectively, I mean, I think the way to think about it is, and first of all, I suppose it's a little bit rich for an arm of the state of Illinois to be criticizing someone for funding its pension, as I'm sure every member of the court. Well taken. But setting that aside for a moment, I think the idea is that there are kind of competing policy demands here. One is to have a stable pension for the working men and women of the state. That's why the union, I think, so strongly supports this position. And I think the other component about reasonableness is we were induced to do this, right? ComEd, as a shareholder, is induced by the commission to put your money in the pension system where it can never be withdrawn. Under the promise that there will be a rate of return provided on it, to the extent that this excess provides benefit to rate payers. It is, I think, a little perverse to turn around and say, after the fact, actually what we meant, you would only get a rate of return one time, but that we are allowed effectively to violate the Hope and Bluefield principle going forward and make you give away this benefit that reduces rates for the public for free in the future. Thank you, Mr. Berlo. We'll turn it over to Mr. Dodds. And thank you for your patience, Mr. Dodds. If you'd like to proceed, and maybe after you've introduced yourself, pick up on that last point would be helpful to me anyway. Certainly. May it please the court, counsel. My name is Brian Dodds, appearing on behalf of the Illinois Commerce Commission in here in this appeal. I want to make just a couple of very brief remarks, but I will turn first to that pension asset issue. And then with the remainder, I think, focus on the return on equity, which is what the bulk of Mr. Berlo's presentation addressed. So, as counsel noted, we are moving out of the sunset formula rates process into the multi-year process, which is essentially a reversion back to traditional rate making under Article 9, with the exception that the utility has the benefit of four test years planned out in one proceeding and annual reconciliations to true up their costs. That reduces risk and reduces regulatory lag for the utility. That's important to keep in mind here. Now, what you just heard in the presentation, I think in the briefing, is ComEd neglecting to acknowledge that we have left that formula rate regime and we are back to Article 9 traditional rate making. This is important, especially with respect to pension asset and ROE, because in the old statute under the formula rate statute at 16108.5, the commission was stripped of certain discretion to set return on equity. In particular, we went from evaluating methodologies and finding an ROE that would went from that to 30-year treasury bonds plus 580 basis points, mechanical. We have been revested with the ability to evaluate the various proposals in front of us, and we received numerous methodologies in the ROE. But turning first to the pension asset, Mr. Berlo is correct, and I think I agree with the back and forth around the definition of a pension asset. A pension asset is recorded for accounting purposes when the company's contributions exceed the cost to cover their pension outlays, their obligations. Under the formula rates, 108.5c specifically stated that the utility is entitled to an investment return on a pension asset. That provision is found nowhere in 108.18, nowhere in the new multi-year rates. We are, again, back to the traditional presumption around pension assets, and the case law on this is quite clear. I'll direct your honors to City of Alton and the Business and Professional People for the Public Interest, that's a 1991 Supreme Court decision, and the Madigan Appellate decision that we cite in our brief. All of those stand for the proposition that the utility bears the burden to prove by preponderance of the evidence that a cash payment to the pension trust fund created this asset. In other words, the utility does not get to come in and presume that any market performance or ratepayer contribution that caused this net positive number entitles them to an investment return. That is no longer the presumption. Why can't they rely upon the Commission's previous findings in that regard? The problem is, actually, let's dig into the Commission's findings. This turns on the $803 million from 2005. In 2005, in Docket 050597, that was the Commission's docket, staff witnesses recommended outright rejection of any recovery whatsoever for the so-called pension asset, the net positive number. As an alternative, because it was unclear from the record in that case where this money came from, it looked like, as Mr. Berlow points out, the parent company may have taken on debt to cover a shortfall, so that ComEd didn't have to. That is different from a shareholder cash infusion to cover that shortfall. Do you understand? So the difference is the $803 million- How is it materially different? Because we want to incentivize the utility to fund its pension obligations, but not treat it as an investment vehicle, and particularly not treat it for its shareholders as an investment vehicle so they can load up on debt, pump that into the pension asset trust fund, and then earn a statutory return on it. That's the distinction. So whether they got it out of the vault at Exelon or whether they went to the market and borrowed the money, they injected $803 million in. Nobody's correct. Again, this is important. The 50597 docket, it was not clear where this money came from, but the best explanation, at least as a compromise from staff, was that this may have been a debt-based infusion to cover a shortfall at one time. But that's- I'm sorry, did I- No, no, you're making that distinction. I don't understand the distinction between whether it was debt or whether it was equity. I understand that. And I don't care what staff recommended either. I care what the commission found. Right. The commission did not find that this was a shareholder cash contribution. And to your Honor's point, what's the difference between cash and debt? It is not prudent. The commission is not in a position to find it as prudent for the parent company to load up on debt and treat its wholly-owned subsidiary as an investment vehicle through that pension fund avenue. That was ultimately the finding. And the commission was quite explicit in the 05 docket and the 2010-0467 docket. We do not condone the pre-funding of pension obligations in this manner. This was a one-time, you're going to get a weighted debt return of 4.75% because these were special circumstances. But in essence, we don't want to incentivize the utility to, for instance, underfund year after year its pension obligations, take out debt. Isn't this the same special circumstance? Isn't this the same special circumstance ongoing today? I'm not sure I understand you. It's the same money that's still transferred to the pension at ComEd, and it's still a cost, if you will, to Exelon. I mean, it's the same money. It's still there, and it's still advantaging the taxpayers at a certain level, isn't it? I mean, it would be advantaging if there was a debt shortfall that still, or there was a deficit that still remained. But contrary to Mr. Berlow's arguments, we don't forfeit the diminishing argument. The fact that we didn't devote a significant amount of time in briefing, to the extent that that conveyed that we are waiving it, we are not. The diminishing, the importance of the diminishing debt is 20 years later, the presumption was that this debt would be diminished, that it would actually be paid down before it ultimately matured. The witnesses here, including Mr. Tolstorf, in his rebuttal testimony at page 35927, said, look, this $803 million was a unique treatment. We are not on the same factual posture here. That was the credibility determination that the Commission made crediting Mr. Tolstorf over ComEd witness Levin. And by the way, the record in this case from ComEd consisted of a work paper showing payments only going back to 2010, that we have never seen receipts of where this 2005 money came from. So again, in 050597 and 100467, the best inference was this may have been a debt payment. And in our traditional rate proceedings, we do not credit as prudent the parent company taking debt and covering a shortfall and then overfunding in order to create a pension asset. That was the rationale and the policy underlying this. And we cite in page 40 in our brief to the many traditional rate cases where a utility has come in, sought recovery of a pension asset and failed to carry their burden to show that this was a into the subsidiary. So we urged the court to affirm on that basis as well. Unless your honors have questions, I'd like to get to the ROE issue. Before we do that, is your position that even if they had proven it was a cash infusion and all the I's were dotted, the T's crossed, and there's no question about that, you still would say it wasn't prudent? Am I correct? No, that is not to be clear. Thank you for the question. That is not my position. That's not the commission's position. The commission is bound to approve rates which are prudently incurred for using useful material for plant and result in just and reasonable rates. And so ultimately, what our questions are always boiling down to is, was this management decision to infuse this capital in a prudent one? If there was a pension shortfall and it was a cash payment in from shareholders to cover that shortfall as a pension holder myself, yes, that would be a prudent decision. What we have here is not, the problem is ComEd failed to carry its burden in 05, in 2010, and today that they actually, that that was actually what the parent company was doing. Ultimately, and I'll just quote the order, this is 369 to 370, ComEd has come in with nothing but broad assertions that this was a shareholder cash funding rather than ratepayer funding. And under traditional rates, if they haven't proven that case, we presume that this was a ratepayer funded pension recovery or pension offset. And for that, they do not, they're not entitled to a return. We think substantial evidence supports that and we urge your honors to affirm on that basis. Unless your honors have other questions, I'll turn with the remainder. You presume it after acknowledging in 2005 that you gave them some adjustment. And just to put another layer on this, I mean, it's less than 3% return, the $25.3 million on $8.3 million. So it's not like you were paying off principal unless the interest rate was so much lower than 3% at the What they credited them was that we're going to give you a weighted debt return of 4.75%, which is less than the weighted average cost of capital, which is what they were asking for and what they're asking for here, frankly. So the money isn't the same, your honor. But if your honors, unless your honors have other questions on that, if I could turn- We probably do, but if you'd like to go to the other topic, please do. Sure. So with the ROE, this is actually really important. The return on equity, again, was mechanically calculated before. Here, we're dealing with a situation in which the commission is investigating the various methodologies. I'll just drill right down to the CAPM consists of a risk-free rate, usually the treasury bills, a risk premium, and then a beta. A beta, like Mr. 1.0 means tight correlation with the stock market. A beta of 0.0 means no correlation. Mr. Grace, ComEd's own witness, testified that a typical beta range will be from 0.4 to 0.8. What the commission ultimately approved was 0.705. So it was on the higher range, which is what ComEd wanted. I'll just note here that there was a proposal from staff here that the commission simply adopt the formula rate return on equity, 8.91%, which is five basis points higher than what they ultimately approved. So five one-hundredths of a percent from the last case is the real number that we're talking about in terms of differences. The commission rejected this because of the methodology, because we're in a new statutory framework. We can't just do what we did in the formula rates. We have to weigh these methodologies. Okay. So what Mr. Berlow states, I just want to put a record site in front of your honors just to clarify this. ICCB witness Gorman testified that when you take staff's DCF and CAPM with a monthly only beta of 9.33%, that gets us our 8.905. So ComEd is trying to collapse the distinction between two propositions here. They're saying that if no witness recommended it, then it lacks substantial evidence. And those are not the same things. And we know they're not the same things because the appellate court in CUB and in the Ameren decision that we cite said they're not the same things. I'll just read from the CUB decision in 2018. There, again, dealing with the utility, the commission is averaging CAPM and DCF and is adjusting some of the inputs. I think, as your honor pointed out, their authority to adjust the inputs and evaluate the methodologies. In the CUB case, at paragraph 35, the court said, ideally, one expert would have presented flawless analysis suggesting impeccable accuracy to determine ROE. Unfortunately, this is not the nature of rate making. So does the commission have the authority to look at these methodologies and the inputs and say, this doesn't accurately capture, on the record in this case, it doesn't accurately capture the risk to Commonwealth Edison Company? That's what the commission did here. And the reason we know that that's what they did was they were presented with both weekly betas, specifically ValueLine and Bloomberg from staff at ComEd, and then monthly betas. They looked at the ValueLine and Bloomberg weekly betas and said, this doesn't track the risk that is analogous to this utility under multi-year rate planning. And again, the risk is lower. The regulatory lag is lower. How did they come to the conclusion that it didn't track, counsel? How did they develop that expertise? They compared, well, first off, they compared the proxy groups of the 17 companies and largely adopted it, but then noted that the ValueLine and Bloomberg weekly betas were significantly higher than the monthly betas that the utilities and staff had put forth, and higher than the monthly regression analysis that staff had put forth. I see my time. Oh, you've got time. That's just your warning. I'm sorry. They looked at the ValueLine and Bloomberg betas, the weekly betas. Oh, I see my time is up. Could I finish that? Yes, please do. They looked at the ValueLine and Bloomberg weekly betas, compared them to the multiple monthly betas that were proffered, and noted, while it is our convention to average the two to get this risk index, these appear to be significantly higher than the monthly ones. We average the two in order to reduce error, essentially. We're trying not to get a spot, a snapshot of the market that is a deviation from the norm. So, we normally average them. But when we look at those weekly betas, they were significantly higher than the monthlies. And so, in the commission, in its discretion, is saying, look, we want to arrive at a just and reasonable rate, ultimately 8.905 percent. Again, five one-hundredths of a percent different than the last rate case. We want to arrive at an ROE that will lead to just and reasonable rates, based on a methodology that is sound. ComEd's position is essentially, if parties come in and produce a bunch of flawed analysis, the commission's hands are tied and we have to defer to the utility. That's their theory. And that is not found in the case law in CUB or in the AMR decision. And for those reasons and those in our brief, we ask that you affirm the commission. Thank you, Mr. Dodds. Justice Stitz? I don't have any questions. I do not. I do want to follow up on the last statement that you made. I think the point that Mr. Berlo was making was that, yes, the commission chose the monthly betas because they were lower, but no expert testified that you could only use monthly betas, that all the experts testified that you should use, in some sense, both monthly and weekly betas. Am I correct about that? I believe, my understanding of the record is that Mr. Gorman, again, at 31679, this is the commission crediting his rebuttal testimony, noted that while it is my initial recommendation, the same way that staff made an initial recommendation of just adopt the formula rates, but here's our alternative if we walk through various analyses. Mr. Gorman had an alternative. If you take out the unanalogous companies, you will arrive at a 9.33 growth rate that is based on monthly betas. That's where we get that 9.33 number from which the commission averaged. That's at 31679. 31679 is my understanding of the record. Okay. Thank you, Mr. Dodds. Mr. Berlo, if you could pick up right there. Certainly, Your Honor. Starting with the return on equity point here, the commission says that we're impermissibly, sort of the theme here is that we're impermissibly collapsing two points. One is the substantial evidence point reflected in Hartigan, which I'll note again, the commission still seems allergic to mentioning. And then the due process point recognized in Ohio Bell. And our point is that I would certainly understand if the court were inclined as just a matter of constitutional avoidance to rule based upon the substantial evidence point, which is simply that if the commission has expert testimony about how you do things, and it ignores all of it and charts its own course, then its decision is not supported by substantial evidence. That would be the easy way to rule. I think the due process point comes on the back end, which is if it's going to go down that road to the extent it's able to do so, it needs to provide notice and an opportunity to be heard by the public utility. Because think about this from ComEd's perspective and imagine that you're back trying a case. When were we ever told that monthly only betas were on the table? When were we ever told that a non-constant grade of growth was ever on the table? And the answer is we weren't. There was never an expert who came along and said, this is a methodologically sound way of approaching the measurement of these very specific things. What I think is interesting, and Justice Brennan, you asked the question during my presentation, and I think you heard it from the commission here, and it's quite deft. They say, well, the reason why we made these adjustments is because ComEd has a lower risk than the members of the proxy group. And I go back to my answer, Justice Brennan, to you, and I think it seemed pretty like we sort of reached an understanding on this, that if we're measuring the proxy group, what is the relative risk of the proxy group to the market as a whole? What is going on with ComEd is irrelevant to that measurement. We are not disputing the case law that says on the back end after you get the financial models, that if there's some evidence based reason to say, look, the proxy group is sufficiently different from, in this case, ComEd, but it would be any public utility, that we need to have some sort of an adjustment. We're not questioning the law that says if the evidence and there's an expert opinion that supports making that adjustment, you can do it. What we're saying is you can't go in and say that company A that is publicly traded is riskier because ComEd's risk has been reduced. And that's what the commission just told you. The other point I'll make here is that the experts in this case told the commission how they would deal with the fact that in the words of one of them, one of the experts, that the weekly betas were high. And they said, well, the way you do that is you normalize the betas, you do a mathematical calculation to the data itself, and then you plug it in. The commission set that opinion aside. It said, we recognize the problem, we will come up with our own solution, regardless of what anyone else says about how you solve for that problem. And then the last point I want to make here, with respect to the return on equity issue, is that they really fall back into this idea that we are going to impose a straight jacket on them, and that they will be unable to critically analyze these financial models, which are the, I think we can agree, the foundation of all return on equity decisions in these kinds of cases. This is the best way of trying to figure out what the right return on equity is that science knows. And their response is, well, you're going to put us in a straight jacket. They can still average. I just said that there's case law saying they can do back-end adjustment. And I even concede for purposes of this case, though I think that may be a future case, they can go in and tinker and meddle with the math. What they can't do is tinker and meddle in a way that no expert said was appropriate. That's when they go too far. That's when they're clearly in the Hartigan and Ohio Bell point. Turning, if I may, just briefly to the pension asset issue, Justice Brennan, Justice Hedl, both of you, I think, asked the central question, which is, aren't we able to rely on what the Commission said before? And I'm going to quote briefly from the 2005 case. Exelon chose to pre-fund ComEd's pension plan with an equity contribution expending a rate of return. I don't know how much clearer it could be than that. And so for the Commission to come along after the fact and say, we don't know if it was exelon, I think, Justice Hedl, Justice Brennan, you rightly express a great deal of skepticism about that. The other point here is that this was not a one-time thing because they did it again in 2007. They gave us a full rate of return on the full amount of the pension asset, and again in 2011. And then the cases that they're relying on, all involved, evidence that the funds came from rate payers, affirmative proof that rate payers paid for the asset. That is completely lacking here. And so we're talking about comparing apples and tomatoes. Mr. Berlow, what is the remedy? What do you want us to do? Do you want us to send this back to the Commission so you can prove that these were pension assets of exelon and then ask them for an appropriate return? Do you want us to assume that the $803 million is still there, it hasn't moved, and just go back and ask for the appropriate return? What is the remedy that you're asking for? Your Honor, I think there's a slightly different remedy as to both. I think with respect to pension asset, I think because of the due process component and as well as because of the Hartigan rule, I think the answer would be a remand back to the Commission for it to enter an appropriate rate of return as to our pension asset that we had fully proven up and that they have absolutely no basis to believe is not there. We can debate what the right rate of return will be. I freely admit that we may not all agree about what the rate of return would be, but I think that's what the issue would be on remand. With respect to return on equity, if we prevail here. I didn't ask that question, but maybe my colleagues might. Mr. Berlow, I do have one question following up on Justice Heddles. It's your burden, it's CONMED's burden to show that these monies did not come from ratepayers, that they came from shareholders, or I guess in this case, debt. Other than the previous, your characterization of the Commission's previous decisions as it relates to this bucket of money, the 800 plus million dollars, is there anything in this record that would support a finding, which is your burden, that this is not ratepayer money, that it was shareholder money or debt money? So, Justice Brennan, if I can kind of answer this question, that there are sort of two buckets of time that are relevant to this. The first is the initial funding, the 800 million in 2005, and then the additional 100 million that was put in in 2009. We think that we are fully capable, and it's appropriate for us to rely upon the Commission's factual findings in those cases. So, Mike, okay, and I get that you think you should be entitled to rely on that, and it's not, doesn't seem like an irrational position, but I guess my question is, if one was to completely discount your characterization of those previous cases, is there anything in the record that we could look to that would answer that specific question? I don't think that we endeavored to reprove that which we had already proven and was uncontested previously. I mean, I think, assume for a moment... And then when you get into the formula rate period, the uncontroverted evidence in the record was that it is mathematically impossible for ratepayer money to end up in the pension asset because of how reconciliation worked under the formula rates. That was uncontested evidence and testimony that we put in the record. No party disputed it. So far as I can tell, the Commission doesn't dispute it either, that it was just a mathematical impossibility. So, effectively, what we get is we now have a 1.219, give or take, billion-dollar pension asset that is reducing rates for ratepayers, actively reducing the rates that ratepayers pay, and we're simply saying that the Commission can't compel us to give away that benefit for free with no rate. Justice Peterson, do you have any other questions? I do. All right. Gentlemen, I think we could do this all day long. But thank you very much for your presentations here today. We will take this case under advisement and issue a ruling in due course. Have a wonderful afternoon, gentlemen.